UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:23-cr-20382-MD

UNITED STATES OF AMERICA

v.

BRENT JONES,

    Defendant.

_____/

**REPORT AND RECOMMENDATIONS**

    **THIS CAUSE** is before the Court upon Defendant Brent Jones's Motion to Suppress (ECF No. 17). The Government filed a Response in opposition (ECF No. 26), to which Defendant filed a Reply (ECF No. 31). Both Parties submitted supplemental briefing.[1] (ECF Nos. 41, 42). The matter has been referred to the undersigned United States Magistrate Judge to take all necessary and proper action as required by law.[2] (ECF No. 21). I convened an evidentiary hearing on the Motion. (ECF Nos. 23, 39). Having considered the Motion, Response, Reply, the supplemental briefing, the record, the evidence and argument advanced at the hearings, and being otherwise fully advised in the premises, the undersigned respectfully **RECOMMENDS** that the Motion to Suppress be **GRANTED, in part**, and **DENIED, in part**, for the reasons that follow.

**I.   BACKGROUND**

    The charges in this case arise from a traffic stop of a suspected stolen vehicle and discovery of a firearm in that vehicle. Defendant was charged by Indictment with possession of

---

[1] At the initial evidentiary hearing, Government's counsel disclosed additional body worn camera ("BWC") footage of Defendant's arrest, which counsel reviewed in the courtroom and then jointly requested a continuance of the evidentiary hearing and opportunity to file supplemental briefing.
[2] The case has since been transferred to the Honorable Melissa Damian.

a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Defendant moves to suppress his statements made during his arrest, the subsequent interrogation, and the evidence collected from his cellphone pursuant to a search warrant, which was issued in reliance on his statements.

On March 15, 2024, the Court held an evidentiary hearing on Defendant's Motion. Two witnesses testified: Detective Anthony Yarusso ("Detective Yarusso") and Detective Leon Paige ("Detective Paige").

## II. FINDINGS OF FACTS

On March 17, 2023, law enforcement received an alert that a stolen grey Infinity Q50 (the "vehicle") entered Miami Beach from the McArthur Causeway. Detective Yarusso was dispatched to find the suspected stolen vehicle; Detective Yarusso was driving an unmarked, grey Jeep Cherokee with two other officers accompanying him driving a marked vehicle. Detective Yarusso found the vehicle heading southbound on Alton Road. Detective Yarusso proceeded to tail the vehicle, heading southbound, without activating lights or sirens. Detective Yarusso tailed the vehicle for approximately two and a half minutes. Another marked vehicle that was traveling northbound, the opposite direction of travel, activated its lights and sirens and proceeded towards the stolen vehicle to effectuate a traffic stop. Once the northbound marked unit activated its lights, Detective Yarusso in the unmarked Jeep and the officers in the other marked vehicle then activated their lights and sirens.

Defendant, who was driving the stolen vehicle, accelerated and turned right on Fourth Street, where he was met with heavy traffic. Defendant then exited the vehicle and ran on foot. Detective Paige, who had followed the stolen vehicle on to Fourth Street, chased Defendant. Defendant ran into the parking lot of a nearby Burger King where he fell to the ground. From

BWC footage, Defendant can be seen running wearing a black shirt and light-colored pants with a ski mask covering everything but the center of his face. After he fell, Detective Paige apprehended Defendant and forcibly rolled Defendant over to his stomach and then proceeded to kneel on Defendant's back. Defendant audibly grunted against the weight of Detective Paige's knee on his back as he yelled repeatedly in pain to the officers, "I have bone cancer!" Officer Pichs-Picado[3] approached and assisted Detective Paige in keeping Defendant down. Once Detective Paige stood up, Officer Pichs-Picado placed his knee on Defendant, pressing into Defendant's back. Detective Paige and Officer Pichs-Picado ignored Defendant's expressions of pain and Officer Pichs-Picado continued to leave his knee firmly resting on Defendant's back. Defendant continued to shout that he has bone cancer and report that Officer Pichs-Picado was hurting his back.

Back at the vehicle, a passenger (K.B.) had exited and was standing next to the vehicle. Miami Beach Police Officers Renzo Chumbe and Pichs-Picado approached her. Officer Chumbe shouted for her to "stay in the fucking car." K.B. sat on the ground next to the vehicle. Officer Chumbe walked around the front end of the car and pointed his firearm at her and yelled at her to "get on the fucking ground" several times. K.B. then laid on the ground and flipped to her stomach. The officers placed K.B. in handcuffs as she cried "I don't know what is going on, please, please, please help me . . . ." While still lying on her stomach, K.B. turned to look at Officer Chumbe. In response, Officer Chumbe screamed "stop fucking resisting, you dumb bitch." K.B. cried and denied that she was resisting.

---

[3] The spelling of the instant officer's name is based on review of Defense's Exhibit 4, which is the Miami Beach Police Department's Incident Report. The full name of the officer, or even the correct spelling of the officer's name, could not be verified by Detective Paige or Government counsel.

3

K.B. continued to plea to those around her asking what was going on and repeatedly asked for someone to help her; she did not receive a response. Her screams are audible over the sirens and the officers' radios.

Officer Pichs-Picado returned to Defendant laying in the parking lot and commanded Defendant to get up while simultaneously pulling Defendant off the ground. Defendant limped away, telling Officer Pichs-Picado that he has bullets in his groin. Detective Paige shouts to his colleagues, "Got him!"; "Got his ass!"; and "Nobody gets away from me, bro!" Exh. 3.

Officer Pichs-Picado escorted Defendant to a nearby curb and told Defendant to sit down. Officer Pichs-Picado swung Defendant on to the curb. Defendant yelped and repeated his statement that he has bullets in his groin. Officer Chumbe then grabbed Defendant by the collar of his shirt, neared Defendant's face and repeatedly yelled for him to "Shut the fuck up." As Officer Chumbe storms away, Defendant repeated his complaints of pain caused by the bullets in his groin.

Another officer (Damus[4]) began searching Defendant. Defendant rolled on the ground complaining of pain. At this time, K.B. was seated approximately fifteen feet away, on the same curb. She can be heard calling out "excuse me?" followed by a sharp cry "Ow!" Defendant pleads with officers not to hurt her. An officer can be heard barking commands at her, addressing her as "bitch." Her sobs and pleading with officers remain audible on the BWC throughout Defendant's interaction with the officers at the scene, sometimes drowning out Defendant's voice. Exh. 5.

An officer then asked Defendant what he has in his pockets as they adjusted him on the sidewalk to empty them. Defendant asked repeatedly "what did I do?" An officer asked Defendant if he wants to sit up rather than remain laying on the sidewalk. Defendant said no

---

[4] Officer Damus's full name was not provided.

4

because the officers had previously kneed him in his back. An officer inquired in response, do you need fire and rescue services; Defendant replied, "I hope not." The officer repeated the question until Defendant responded, "I do not think so" and that he would "just stay here."

Defendant told the officers that they scared him and that he was only giving someone a ride to Miami Beach. An officer asked Defendant, "you were the driver of the vehicle?" Defendant responded "Yes, of course." After being searched, Defendant is then seen sitting upright on the curb. Officer Damus asked Defendant his name, which he provided. Officer Damus then asked if it was his car; Defendant admitted it was not and stated that someone gave him the keys but told him not to drive it.

An officer approached Defendant and asked, "Man, you got white on you?" Defendant responded in the negative but acknowledged that what officers found on him was "molly," which he told them he takes because he has post-traumatic stress disorder ("PTSD") and anxiety. Officer Damus then told Defendant that the officers still needed to identify him, and asked Defendant if he has a social security number. Defendant responded that someone stole all of his identification information.

Detective Paige then asked Defendant if he wants to go home. Defendant responded, "Yes, I do." Detective Paige answered, "Right now, you are going to be under arrest. So, listen to me. The quicker we get your information and get you processed, the quicker you are going to get home." Defendant's response is not entirely audible, but Detective Paige retorted "give me what you are going to give me; and I am going to look you up." Defendant then provided his social security, his name along with the spelling of his name, and his date of birth. Defendant then volunteered statements about his "ex-girl," explaining that was the only problem he had at that point.

Defendant then attempted to get the officers' attention by stating, "Excuse me, officer," and "Is this a federal case?" Defendant also asked those around him what was happening. An officer responded, "You had drugs on you and a gun." Defendant countered, "That was for protection" and that he was a cancer patient.[5] The officer replied, "Cancer patient? Who takes pistols?" and then started to walk away from Defendant. Defendant proceeded to say "you misunderstand, my ex-girl . . . ." The officer turned his back and told Defendant that he can explain it in court.

As the officer walked away, Defendant looked to Officer Damus and stated, "Tell him to write that shit up right, bro. That shit is constructive possession man. That shit wasn't on me." Exh. 11. Officer Damus then asked, "What wasn't on you?" Defendant responded, "The gun." Officer Damus responded, "The gun?" Defendant clarified that the firearm was not physically on his person. Defendant then proceeded to speak to K.B. and apologize for being involved in this because she had nothing to do with it. Defendant then told Officer Damus that he was paid twenty dollars to drop people off at the beach.

Defendant then muttered something about "getting some understanding" about what was happening. Officer Damus responded that "they will give you some understanding about what is going on, but for right now just shut up." Defendant asked Officer Damus if he had both of his cellphones several times. Officer Damus responded that he had one of the cellphones with him. Defendant explained that there was a second cellphone.[6]

---

[5] *See* Exh. 11.
[6] After Defendant's arrest, Detective Yarusso submitted an affidavit in support of a search warrant for Defendant's cellphone. Detective Yarusso attested under penalty of perjury that Defendant had abandoned his cellphone and that, after being arrested, Defendant made no efforts to retrieve the cellphone. The BWC footage that was discovered at or around the time of the originally scheduled hearing reveals that Defendant had indeed made several demands for the return of both of his cellphones.

Officer Chumbe then approached Defendant and asked, "What's good, bro?" Defendant responded, "Please tell me." Officer Chumbe replied, "I don't know, you tell me. You are over here complaining and shit like a female. Why don't you shut the fuck up. Shut the fuck up, dog. We are about to get you out of here, right now. . . ." Ex. 11.

Approximately five minutes later, Officer Damus and Detective Yarusso lift Defendant off the sidewalk and escort him to a police vehicle. Notably, Detective Yarusso did not turn on his BWC for this interaction with Defendant despite acknowledging at the hearing that it is Miami Beach Police Department's policy to do so. While Officer Damus adjusted Defendant's handcuffs, Detective Yarusso asked Defendant, "What kind of felonies you got?" Defendant responded, but not all of Defendant's answer is audible. Defendant did describe a prior felony for armed kidnapping and aggravated battery. Defendant was then escorted in a marked police vehicle to the Miami Beach Police Department.

At the department, Officer Damus escorted Defendant to a holding cell. As Officer Damus locked Defendant in the cell, Defendant began speaking. Officer Damus responded, "that's okay, just save it for them when they come, okay? Just save it for them when they come."

Approximately two hours later, at 12:41 A.M., Defendant was transferred to a small room that contained two tables on either side of the room with accompanying chairs. The door into the hall remained open the entire interview; resulting noise can be heard from the hallway. Detective Yarusso assisted Defendant in sitting in the chair alerting him to the fact that the chair was not entirely stable. Detective Yarusso asked Defendant if he was alright in the chair, and Defendant confirmed that he was.

Detective Yarusso asked Defendant questions starting with his identification information and background. Defendant revealed that he had attended some college. Using a form that was placed before Defendant, Detective Yarusso then advised Defendant of his *Miranda* rights; Defendant acknowledged each line on the form and signed the form.

Detective Yarusso commenced questioning Defendant about his night. Defendant made a number of incriminating statements, including his admission that the firearm was his and that he is a convicted felon. During this interrogation, Defendant gave long narrative responses and explanations, often without prompting from Detective Yarusso.

Defendant additionally described that, two days prior, a black Lexus had tried to run him over and that he was afraid he was being followed by those same individuals at the time of his arrest because he had not realized it was the police who were following him. Detective Yarusso asked why Defendant fled instead of stopping when the police engaged their lights. Defendant responded that he was too afraid of the vehicle behind him that did not have lights activated. Once Defendant stopped the car, he stated he fled from his vehicle because he was afraid and there were so many officers.

Eventually Detective Yarusso questioned Defendant about machine guns, offering that giving up information about how or where to obtain machine guns was "probably [his] best way out of here;" Yarusso went so far as to imply that Defendant could give up his friend *or* do time. The interview ended approximately ten minutes later.

### III.   DISCUSSION

Defendant moves to suppress all inculpatory statements made to law enforcement as well as the results of any search of his cellphone seized at the time of his arrest. Defendant argues that his statements before receiving *Miranda* advisements are the result of custodial

8

interrogation. Defendant argues that any statements made after receiving and waiving the *Miranda* advisements must also be suppressed because they were made amidst the officers' interrogation, after the excessively aggressive arrest, and after promises of leniency were made; as a result, the *Miranda* advisement could no longer function effectively. Defendant further contends that any statements he made were not voluntarily given after considering the totality of the circumstances, including the unnecessary violence of Defendant's arrest. With respect to the cellphone, the Government has withdrawn its argument that he abandoned the cellphone at the scene and lacked standing to challenge the search and will not seek to admit evidence collected from the phone, thus the motion is moot.

### A. Pre-*Miranda* Statements

The Government seeks to admit at trial three statements made at the time of Defendant's arrest, which include "That was for protection"; "Tell him to write that shit up right, bro. That shit is constructive possession man. That shit wasn't on me"; and his response to the clarifying question "what wasn't on you:" "The gun." The Government acknowledges that these statements were made before Defendant received *Miranda* warnings and concedes that these statements were made while Defendant was in custody, but argues that the first two are not subject to *Miranda* because they were made spontaneously, and the third similarly was made only in response to an officer's clarifying question, as opposed to interrogation.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The privilege against self-incrimination guarantees that a defendant's statements made during custodial interrogation cannot be used against him unless effective procedural safeguards are adopted to ensure the defendant is aware of his rights. *United States v. Williamson*, Case No. 19-20144-CR, 2019 WL

9

4418608, at *2 (S.D. Fla. July 11, 2019), *report and recommendation adopted*, 19-20144-CR, 2019 WL 3451081 (S.D. Fla. July 31, 2019) (citing *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966)). If, at the time a custodial interrogation begins, the suspect has not been advised of his *Miranda* rights, any statements he makes to law enforcement during that interrogation may be excluded from evidence. *See United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004) (explaining that the right to *Miranda* warnings attaches at the beginning of custodial interrogation).

The Government asserts that, though Defendant was in custody,[7] his statements are admissible because they were not made in response to interrogation from the officers at the scene. Defendant argues that the three statements that the Government would characterize as spontaneous were made after police actually posed multiple questions that were likely to elicit incriminating responses; that is, the statements were made after law enforcement began interrogating him but without first advising him of his *Miranda* rights.

An "interrogation" for *Miranda* purposes is defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Freeman*, 591 F. App'x 855, 861–62 (11th Cir. 2014). "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit

---

[7] There's no dispute Defendant was in custody; he was in handcuffs and not free to leave. The Government does not argue otherwise.

an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301–02 (1980) (emphasis omitted).

By contrast, voluntary incriminating statements "not made in response to an officer's questioning are freely admissible." *United States v. Suggs*, 755 F.2d 1538, 1541–42 (11th Cir. 1985); *see also Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.").

First and foremost, the Government's arguments that Defendant was not subject to interrogation by the officers is belied by the BWC footage from the scene of arrest. Before Defendant utters the first of the three statements at issue, officers asked Defendant to confirm that he was driving the vehicle, which officers had pursued on the suspicion that it was stolen; they asked him if the vehicle is Defendant's, and he admitted that it is not. Shortly following this exchange, an officer approaches and asks Defendant, "Man, you got white on you?"

The Government's Supplemental Response fails to acknowledge or address the questions by the arresting officers at the scene, focusing solely on what words were spoken most immediately before Defendant made the three isolated statements the Government would seek to admit at trial. *United States v. Benton*, on which the Government also relies, is distinguishable on the basis that *no* questions were asked by the investigating police; the defendant's statement that "no one had seen him throw away the gun" was "simply gratuitous." *United States v. Benton*, 996 F.2d 642, 644 (3d Cir. 1993). It cannot be meaningfully disputed, as the video reveals, that Defendant here was asked at least three questions about the crimes under investigation, questions that were reasonably likely to elicit a response: interrogation had begun. Notably, Government counsel is not seeking to admit Defendant's inculpatory responses to any

11

of these three questions, but would advance the three statements that followed shortly thereafter, on the theory that they were nonetheless "spontaneous."

What ensues between police questioning Defendant about the crimes under investigation and the three statements about the gun further undermine the Government's characterization of the statements as spontaneous. After eliciting Defendant's confession that he was driving the suspected stolen vehicle, that it was not his, and that he was knowingly in possession of narcotics, Detective Paige walks up to Defendant and asked, "[y]ou want to go home, right?" When Defendant agreed that he did, Paige told him "Right now, you are going to be under arrest. So, listen to me. The quicker we get your information and get you processed, the quicker you are going to get home." A few moments transpired, during which Defendant provides the identifying information requested by Paige, before another officer approaches Defendant and asks, "What's up, big dog?" Defendant's response is not audible, but the officer states, "you got drugs on you and a gun" as the officer shrugs his shoulders. It is in direct response to this interaction that Defendant makes the first of the statements Government would advance at trial: "That, that was for protection purposes."

The Government argues that this statement was made without prompting from the officers and, as such, is this not a product of custodial *interrogation*. The Government asserts that this exchange is not materially different from what occurred in *United States v. Suggs*, 755 F.2d 1538, 1541–42 (11th Cir. 1985). In *Suggs*, the Defendant did receive his *Miranda* warnings and apprised arresting agents of his wish to remain silent;[8] thereafter, agents showed him a copy

---

[8] The Government notes *Suggs* is distinguishable on the basis that the defendant there was advised of his *Miranda* rights and invoked his right to not be questioned without counsel, however, the Government would minimize this distinguishing fact because Defendant Jones "has experience interacting with law enforcement." The legal import of his prior arrests and/or convictions is unexplained in the Government's response. To the extent Government counsel would argue that the fact that Defendant had been previously arrested is sufficient to establish that he was aware of all his rights, this argument has not been approved by the Eleventh Circuit. *United States v. Espinosa-Orlando*, 704 F.2d 507, 514 (11th Cir. 1983) (citing *Miranda*, 384 U.S. at 471–72).

12

of the indictment charging him and his wife with falsifying travel vouchers. He responded by making some comment akin to "everybody falsifies their travel vouchers." In finding no *reversible error* in admitting the statements, the reviewing court deferred to the credibility findings of the trial court that the defendant's statement was not the result of any government probing. *Id.* at 1542. By contrast, Defendant here had been subject to interrogation and not advised of his *Miranda* rights; *Suggs* is not persuasive.

The second and third statements the Government seeks to admit follow shortly thereafter and, candidly, present a closer call of whether they were responsive to the officer's initial questioning. "Context is determinative. Where a suspect responds to an officer's initial question with a voluntary statement aimed at committing another crime, it is not protected by *Miranda* because it is unresponsive." *United States v. Corey*, 861 F. Supp. 2d 1341, 1345 (S.D. Fla. 2012), *aff'd*, 521 F. App'x. 759 (11th Cir. 2013). After Defendant has made the admission that the gun was "for protection purposes," and he repeats that he is a cancer patient, an officer challenges him: "A cancer patient? Who takes pistols?" In the moments that follow, the officer interacting with him continues to oscillate between engaging him and ignoring him, concluding with the direction to "explain it in court." Defendant calls out to Officer Damus: "Tell him to write that shit up right. That shit is constructive possession. That shit wasn't on me." Finally, Officer Damus asks "what wasn't on you?" And Defendant states "[t]he gun." The Government argues that the first was not responsive to any interrogation and the second statement was made only in response to a clarification question, thus both are admissible.[9]

The Supreme Court has consistently stated that not "all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation."

---

[9] Generally, clarifying questions after a suspect's spontaneous statement are admissible. *See United States v. Villegas-Tello*, 319 F. App'x 871, 876 (11th Cir. 2009).

13

*Innis*, 446 U.S. at 299. However, the Government's arguments that Defendant's statements are spontaneous "ignore[] the *Innis* standard of 'interrogation,' which sweeps more broadly than just probing questions." *United States v. Thomas*, No. 4:13-CR-22-RLV, 2014 WL 793359, at *6 (N.D. Ga. Feb. 25, 2014), *aff'd*, 621 F. App'x 618 (11th Cir. 2015).

Defendant's statements cannot be seen as spontaneous when they were in response to the officer's statements of: "A cancer patient? Who takes pistols?" and "You can explain it in court." While the officer speaking walks away from Defendant, it is clear that Defendant is attempting to respond to that officer's questions and statements. Defendant then directs his responses to Officer Damus who then continues to speak with Defendant. Defendant's responses cannot be seen as spontaneous and unresponsive to the question as the Government suggests. And, as such, are a product of custodial interrogation.

Moreover, "a confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010) (quoting *Bram v. United States*, 168 U.S. 532, 542 (1897)). "While the failure to comply with *Miranda* creates a presumption that a confession was not voluntary, an examination of the totality of the circumstances is necessary to determine whether the confession was actually voluntarily given." *Id.*

Here, Defendant's statements cannot be considered voluntarily made. The statements the Government seeks to admit at trial are within a five-minute span of Detective Paige promising Defendant that his best chance of getting home quickly is to give the information officers sought from him. The Government asserts that Detective Paige's promise solely refers to Defendant providing identification information. An uncounseled layperson such as Defendant would not

14

reasonably be expected to interpret Detective Paige's comments so narrowly. *See Lall*, 607 F.3d at 1287 ("It is inconceivable that [defendant], an uncounseled twenty-year-old, understood at the time that a promise by [the detective] that he was not going to pursue any charges did not preclude the use of the confession in a federal prosecution. Indeed, it is utterly unreasonable to expect any uncounseled layperson, especially someone in [defendant]'s position, to so parse [the detective]'s words."). As noted above, interspersed amongst the questions about Defendant's identity, the officers ask questions to illicit incriminating information, such as "Man, you got white on you?" and "is that your car?"

Finally, the gratuitous physical aggression at the scene cannot be ignored. As Government counsel acknowledged at oral argument, Officer Chumbe was "out of control," and he is among the officers peppering Defendant with questions throughout the interaction. As Government counsel noted, the confession did not result from actual physical coercion, but the bar is not so low. Considering the totality of the circumstances, though relying primarily on the absence of *Miranda* warnings before custodial interrogation began, I find the Government has failed to meet its burden to show by a preponderance of the evidence that Defendant's statements at the scene were spontaneously made and voluntary. *See Corey*, 861 F. Supp. 2d at 1346 (granting motion to suppress and noting, from list of cases analyzing police interactions with custodial defendants to determine whether statements were product of interrogation, how fact-intensive each case is). I accordingly recommend that the Motion be granted with respect to Defendant's pre-*Miranda* statements.

15

### B. Post-*Miranda* Statements

Defendant argues that his statements after receiving *Miranda* warnings must be suppressed because the *Miranda* warnings were received midstream of the officers' interrogation and thus could not have functioned effectively.

Informing a suspect of *Miranda* rights "generally produces a 'virtual ticket of admissibility.'" *United States v. Douglas*, 688 F. App'x 658, 663 (11th Cir. 2017) (quoting *Missouri v. Seibert*, 542 U.S. 600, 608–09 (2004)). As a general rule, the existence of a pre-*Miranda* statement does not require suppression of a later post-*Miranda* statement that was knowingly and voluntarily made. *Id.* The Supreme Court (by plurality) recognized an exception to this rule in *Seibert*, on which Defendant here relies: when police purposefully withhold *Miranda* warnings in order to obtain a full confession and provide him with full warnings to get him to re-confess, suppression of the post-*Miranda* statement is required, as the law forbids this calculated technique for undermining *Miranda*. *Id.* (citing *United States v. Street*, 472 F.3d 1298, 1313–14 (11th Cir. 2006)).

The evidence here does not support the contention that Detective Yarusso engaged in the type of "question-first and warn later" tactic necessitating suppression of Defendant's post-*Miranda* statements. Prior to receiving *Miranda* advisements, Detective Yarusso made contact with the Defendant as he was being escorted to a marked police vehicle to be transported to the Miami Beach Police Department. As Defendant enters the vehicle, Detective Yarusso asked Defendant if he had any felonies, resulting in an incriminating response from Defendant in the affirmative. The pre-*Miranda* interaction with Detective Yarusso was extremely brief, limited to a question. Given that Defendant made only a single brief incriminating statement in the prewarning stage of the interview, the complete interrogation of Defendant that followed the

16

warnings bore little resemblance to his prewarning statement. *See United States v. Gonzalez-Lauzan*, 437 F.3d 1128, 1138 (11th Cir. 2006). Moreover, the two interactions also took place in different locations, and with approximately a two-hour gap between them. Under the totality of the circumstances, the evidence does not support Defendant's characterization of the interrogation as comparable to the two-step questioning prohibited by *Seibert*.

Rather, the evidence supports a finding that Defendant knowingly and voluntarily waived his *Miranda* rights. Whether a waiver has occurred depends "upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *United States v. Gamez*, No. 06-20149-CR, 2006 WL 8444007, at *2 (S.D. Fla. Sept. 29, 2006), *report and recommendation adopted*, No. 06-20149-CR, 2007 WL 9735341 (S.D. Fla. Jan. 31, 2007). The Government must show, by a preponderance of evidence, that the accused voluntarily, knowingly, freely, and intelligently waived his rights. *Colorado v. Connelly*, 479 U.S. 157, 168–69, 186 (1986). A voluntary waiver is the product of a free and deliberate choice. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Furthermore, in order for the waiver to be voluntary, Defendant must have known the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.*

Before attempting to obtain a *Miranda* waiver from Defendant, Detective Yarusso first determined that Defendant was lucid and capable of understanding his rights by asking his level of education and whether he could read and write. Detective Yarusso read the rights aloud to Defendant, and subsequently reviewed each right, which Defendant acknowledged and initialed. After signing the form, Defendant provided a confession to purchasing and possessing the firearm found in the vehicle and acknowledged he was a convicted felon. After having his right to remain silent explained to him, both in writing and orally, the Court finds that Defendant fully

understood the nature of this right.  *See United States v. Pena*, No. 06-20592-CR, 2007 WL 9753243, at *3 (S.D. Fla. Feb. 14, 2007).

Defendant asserts that the violent nature of his arrest, Defendant's PTSD, and the promises made by Detective Paige all render Defendant's admissions not voluntary, notwithstanding his waiver of his *Miranda* rights.

Factors that may be considered when determining whether a waiver was voluntary include the "defendant's lack of education, or his low intelligence, the lack of any advice to the confused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Waldrop v. Jones*, 77 F.3d 1308, 1316 (11th Cir. 1996).  Defendant completed some college level education and is able to read and write in English.  He was, therefore, capable of reading and understanding the one-page *Miranda* form he was given.

Defendant's argument on voluntariness is strong, but on balance, I find the Government meets its burden—perhaps only by a hair. Government counsel is commended for the self-selection of evidence and decision *not* to advance that which he recognizes he cannot demonstrate was lawfully collected by the police.  But it cannot be ignored that the police here undisputedly obtained statements and evidence from Defendant without regard to the law in several respects, from custodial interrogation at the scene without first Mirandizing Defendant, to promises of leniency in exchange for information about machine guns at the end of the interview which, again, government counsel will not seek to admit at trial.[10] Defendant's post-*Miranda* statements was, by contrast to the arrest scene, calm and without Officer Chumbe's presence or

---

[10] Nearing the end of Defendant's post-Miranda statements, Detective Yarusso begins to ask Defendant about machine guns. As Defendant hesitates to provide more information on the subject, Detective Yarusso states, "That's probably your best way out of this whole mess."  Seemingly in acknowledgment of the impropriety of the statement, the Government does not seek to admit statements made by Defendant after that point in the interrogation.  And thus, this conduct by Detective Yarusso is not considered in this inquiry.

any promises of leniency. The interview was separated from the arrest scene by two hours and occurred in a different, well-lit office environment. Defendant was very responsive to Detective Yarusso's questions and provided information without much prompting from Detective Yarusso. Having viewed the videos from both scenes, I find that the Government has met its burden to show that the post-*Miranda* statement given by Defendant was voluntarily made. *See Pena*, 2007 WL 9753243, at *4.

      C.      **Evidence Obtained from Defendant's Cellphone**

Defendant moves to suppress the evidence obtained pursuant to a search warrant issued for Defendant's cellphone. In response, the Government originally argued that Defendant had abandoned his cell phone. Upon review of additional BWC footage released by the Government after the first hearing on the instant Motion, the Government withdrew its argument that Defendant abandoned his cellphone. Indeed, at the second hearing, Detective Yarusso acknowledged that his statement in his affidavit in support of the search warrant that Defendant had made no attempt to have the phone returned was false. Defendant had in several instances asked Officer Damus for his cellphones. Yet, Detective Yarusso never reviewed Officer Damus's BWC footage nor asked Officer Damus if Defendant had inquired about his cellphones, despite Officer Damus being charged with watching Defendant at the scene of the arrest. At the hearing, the Government agreed not to advance the evidence obtained from this search warrant. Accordingly, the Motion is moot with respect to the evidence obtained from Defendant's cellphone.

**IV.**      **RECOMMENDATIONS**

Based on the foregoing, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress (ECF No. 17) be **GRANTED, in part**, and **DENIED, in part**. The

undersigned **RECOMMENDS** that Defendant's Motion to Suppress be **GRANTED** to the extent he seeks to preclude admission of statements he made pre-*Miranda* and evidence obtained from the search warrant of Defendant's cellphone. In all other respects, I recommend that Defendant's Motion be **DENIED**.

The Parties have agreed to a shortened period within which to file objections. Written objections, if any, must be filed no later than **JUNE 6, 2024,** for consideration by the Honorable Melissa Damian, United States District Judge for the Southern District of Florida. Pursuant to Federal Rule of Criminal Procedure 59(b), Eleventh Circuit Rule 3-1, and accompanying Internal Operating Procedure 3, the Parties are hereby notified that failure to object in accordance with 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions. *See Thomas v. Arn*, 474 U.S. 140 (1985).

**RESPECTFULLY SUBMITTED** in Chambers at Miami, Florida, this 3rd day of June, 2024.

_____
LAUREN F. LOUIS
UNITED STATES MAGISTRATE JUDGE

Copies to:
Honorable Melissa Damian
Counsel of Record